IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **07-cv-1475-JLK**

**DINÉ CITIZENS AGAINST RUINING OUR ENVIRONMENT**,
**SAN JUAN CITIZENS ALLIANCE,**

      Plaintiffs,

v.

**AL KLEIN**, in his official capacity as Western Regional Director, Office of Surface Mining
Reclamation and Enforcement, Denver, Colorado,
**OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT**, a federal
agency within the U.S. Department of Interior,

      Defendants,

**ARIZONA PUBLIC SERVICE** and **BHP NAVAJO COAL COMPANY**,

      Intervenors.

---

MEMORANDUM OPINION AND ORDER

---

**Kane, J.**

      The Navajo Nation comprises over 27,000 square miles in the four corners region of the

southwestern United States.  Born of a history of strife and conflict between American settlers

and members of the Navajo Tribe,[1] the reservation is located within the ancestral homeland of

the Navajo (or Diné, the Navajo word for "people") – the area bounded by Blanca Peak to the

---

[1] This history of strife and conflict culminated in the infamous "Long Walk of the
Navajo," a forced relocation of nearly 10,000 Navajo from their ancestral homeland to a hastily
constructed reservation at Fort Sumner, in the Pecos River Valley.  Following the signing of the
Treaty of Bosque Redondo in 1868, the Navajo who survived this relocation and internment
returned to the newly created Navajo Reservation.

northeast, Mount Taylor to the southeast, the San Francisco Peaks to the southwest, and Hesperus Mountain to the northwest.

Throughout the early history of the reservation, the Tribe relied upon traditional endeavors such as sheep and cattle herding, fiber production, weaving, jewelry making, and art trading for income and employment.  Over the past century, however, large deposits of natural resources (including oil, uranium, and coal) have been discovered on the Tribe's reservation lands.  These discoveries have supplemented the Tribe's income, but they have been, by any fair assessment, a mixed-blessing to the Diné.[2]

Pursuant to the Indian Mineral Leasing Act of 1938, 52 Stat. 347, 25 U.S.C. § 396a *et seq.*, the Navajo Nation negotiates leases allowing third-parties to extract discovered resources in exchange for a set royalty percentage.[3]  In July 1957, the Navajo Nation granted such a lease to the Utah Construction and Mining Company (succeeded in interest by BHP Navajo Coal Company) for the extraction of coal from the Fruitland Formation.  Covering 33,601 acres, the lease area is wholly located within the confines of the Navajo Nation in northwest New Mexico, extending 25 miles to the south from its northern terminus near the San Juan River and Fruitland,

---

[2]  As an example, although the Tribe benefitted directly from the creation of jobs and the payment of royalties resulting from the discovery and extraction of nearly four million tons of uranium from 1944 to 1986, it continues to struggle with a myriad of health and environmental impacts related to the resulting uranium contamination.  *See* U.S. Envtl. Prot. Agency, Addressing Uranium Contamination in the Navajo Nation, http://earth1.epa.gov/region9 /superfund/navajo-nation/ (last viewed May 27, 2010); *see also* Dan Frosch, Uranium Mining Haunts Navajo Country, New York Times, July 26, 2009, http://www.nytimes.com/2009/07/27/ us/27navajo.html (last viewed May 27, 2010).  As a result, the Tribe has banned uranium mining and milling in the Navajo Nation.  *See* Diné Natural Resources Protection Act of 2005, April 19, 2005, http://www.sric.org/uranium/DNRPA.pdf.

[3]  Recently, these royalty payments have been the subject of significant conflict.  *See United States v. Navajo Nation*, 129 S. Ct. 1547 (2009).

2

New Mexico.  In 1960, BHP Navajo negotiated a contract with Arizona Public Service to provide coal to the Four Corners Power Plant, which is located adjacent to the northern end of the lease area.  Coal has been produced from the Navajo Mine since 1963, solely for use at the Four Corners Power Plant.

Because the original lease pre-dated the National Environmental Policy Act ("NEPA"), the Navajo Mine evaded meaningful environmental review for much of its early existence. Although indirectly analyzed in other Environmental Impact Statements,[4] it was not specifically reviewed until BHP applied for a permit to continue surface coal mining operations at the Navajo Mine in 1985.[5]  In connection with its review of BHP's permit application, the Office of Surface Mining ("OSM") conducted an Environmental Assessment ("1989 EA") which resulted in a finding that BHP's proposal to mine 4,816 acres over a fifteen year period and extract 120 million tons of coal would have no significant impact on the quality of the human environment.[6]

The permit was limited to a term of five years under the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1256(b), but BHP could, as a matter of right subject to certain limitations, apply for successive five-year renewals with respect to areas within the

---

[4]  *See* Western Gasification Company Coal Gasification Project and Expansion of Navajo Mine Final EIS ("WESCO EIS"), AR 28-1, 131 to 574; Four Corners Powerplant and Navajo Mine EIS ("Four Corners EIS"), AR 29-1, 131 to 562; and San Juan River Regional Coal EIS, AR 30-1, 30-132 to 239.

[5]  Before the passage of the Surface Mining Control and Reclamation Act ("SMCRA") in 1977, surface mining operations did not always involve "major federal actions" triggering NEPA's procedural requirements.  Mining operations on tribal lands became subject to federal oversight, and NEPA review, in 1984 when, pursuant to SMCRA, the Secretary of the Interior published final regulations concerning the regulation of surface coal mining on tribal lands.

[6]  Although BHP proposed to mine only 4,816 acres, the area discussed in the 1989 EA actually covered a 12,092 acre area.

boundaries of its existing permit.  *Id.* § 1256(d)(1).  SMCRA does not, however, allow for such "matter of right" renewals when BHP seeks "to extend the mining operation beyond the boundaries authorized in the existing permit."  *Id.* § 1256(d)(2).  In such cases, "the portion of the application for renewal of a valid permit which addresses any new land areas shall be subject to the full standards applicable to new applications under [SMCRA]."  *Id.*  Thus, BHP must submit permit revision applications when it seeks to expand its mining operations.

OSM's review and approval (or disapproval) of these renewal and revision applications constitute "major federal action" subject to NEPA's procedural requirements.[7]  OSM's compliance with NEPA in regard to BHP's recent permit renewal and revision applications forms the basis of the instant controversy.[8]  On May 19, 2004, BHP submitted an application for a five-year renewal for its Navajo Mine permit.  Relying upon its own guidelines, OSM's Western Regional office in Denver determined that its decision to approve the renewal application was categorically excluded from NEPA's procedural requirements and approved BHP's application.  Permit Renewal Decision Document, AR 04-04.

Later that year, BHP submitted another permit application to OSM for a proposed expansion of its mining operations into a 3,800 acre area known as "Area IV North."  The application included a request to relocate the Burnham Road to facilitate mining activities in this

---

[7] For a more thorough discussion of what constitutes a "major federal action" and the procedural requirements of NEPA, see *infra* pp. 17-20.  Although SMCRA contains its own public notice and hearing requirements, 30 U.S.C. § 1263, these requirements do not supersede NEPA's procedural requirements.  *Id.* § 1292.

[8] Throughout this opinion I refer to Defendants OSM and Al Klein collectively as "OSM."

area.[9]  OSM conducted an Environmental Assessment, determined that approval of BHP's 2005

Permit Revision Application would have no significant impact on the quality of the human

environment, and approved the permit application on October 7, 2005.  In the accompanying

decision document, OSM imposed two conditions relevant to the instant dispute.[10]  First, BHP

was required to conduct a thorough ethnographic study of Area IV North and develop, approve,

and implement mitigation/data recovery plans for the area before causing any disturbance there

("ethnographic studies").  The second permit condition required BHP to follow OSM's

regulatory procedures for relocating a public road before realigning the existing Burnham Road.

Plaintiffs allege Defendants violated NEPA and the Administrative Procedure Act

("APA") by issuing the 2004 Permit Renewal and 2005 Permit Revision without complying with

certain NEPA procedural requirements or satisfying NEPA's public notice and participation

requirements.  In their First Amended Complaint, Plaintiffs added two claims alleging

Defendants violated both NEPA and the APA by failing to supplement or otherwise include the

Area IV North ethnographic studies, the Burnham Road relocation proposal, or the CHIA in their

analysis of BHP's 2005 Permit Revision Application.[11]

---

[9]  The Burnham Road is a public road on the Navajo Reservation near the Navajo Mine.
It provides access to the Burnham Chapter House for Burnham area residents.

[10]  Plaintiffs also allege that OSM imposed a third condition, requiring performance of a
Cumulative Hydrologic Impacts Analysis ("CHIA") evaluating the cumulative impacts of
continued mining in Area IV North or the Navajo Mine as a whole on affected surface and
groundwater.  Although they acknowledge that, upon completion, the CHIA may be useful for
future permitting decisions at the Navajo Mine, Defendants deny that the approvals of the 2004
Permit Renewal or the 2005 Permit Revision Application were conditioned on completion of the
CHIA.

[11]  Defendants filed motions to dismiss (Docs. 61 and 62) asserting a variety of
jurisdictional and ripeness claims.  In an order dated September 30, 2009 (Doc. 98), I partially
granted those Motions to Dismiss, dismissing as unripe that portion of Plaintiff's Sixth Claim for

Plaintiffs seek declaratory judgment that Defendants violated NEPA and the APA in issuing the 2004 Permit Renewal and the 2005 Permit Revision, in failing to supplement the NEPA analyses relating to the 2005 Permit Revision decision, and by engaging in a continuing pattern and practice of violating NEPA's public notice requirements in taking federal action regarding the Navajo Mine.  Plaintiffs also seek to enjoin implementation of the 2005 Permit Revision regarding mining in Area IV North until such time as OSM has complied with NEPA. With respect to the 2004 permit renewal, Plaintiffs seek to enjoin any action that authorizes disposal of coal combustion waste ("CCW")[12] in the mine permit area, the relocation of Navajo Nation tribal members, or blasting operations near tribal member residences until compliance with NEPA is achieved.

Plaintiffs further request an order requiring Defendants to provide specified public notice and participation under NEPA for permitting actions regarding the Navajo Mine, including advance public notice of proposed agency actions and publication of such notices in tribal and non-tribal periodicals in both English and the Navajo language.  Finally, Plaintiffs request that Defendants be ordered to develop an EIS for the Navajo Mine in its entirety, including the Area IV North expansion.

On March 1, 2010, the parties completed their briefing on the remaining claims, and on August 25, 2010, they presented oral arguments.  This matter is now ready for my review.

---

Relief (duty to supplement under NEPA) that relates to the Burnham Road realignment and Cumulative Hydrologic Impacts Analysis.

[12] Perhaps wary of negative connotations associated with the word "waste," Defendants insist this material is properly called Coal Combustion Byproduct.  Although I refer to this material as Coal Combustion Waste, I make no judgment as to its relative value or danger.

## II.  Jurisdiction and Venue

Plaintiffs' NEPA claims are properly asserted under the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.. See, e.g.*, *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 740 (10th Cir. 2006).  Although the APA does not provide an independent grant of jurisdiction to review agency action, federal question jurisdiction extends to APA claims unless Congress has specifically precluded judicial review of the particular agency action that is the subject of the claim.  *Califano v. Sanders*, 430 U.S. 99, 105, 107 (1977); 5 U.S.C. § 701(a)); *see also Greater Yellowstone Coal. v. Tidwell*, 572 F.3d 1115, 1120 (10th Cir. 2009).  Because Congress has not expressly precluded review of the OSM decisions at issue here, I have jurisdiction over Plaintiffs' claim pursuant to 28 U.S.C. § 1331.[13]

Furthermore, venue in this court is proper pursuant to 28 U.S.C. § 1391(e) because the NEPA decisions at issue were made by OSM's Western Regional office located in Denver, Colorado; all of the permitting records and agency personnel with knowledge of these issues are located in Denver; and the agency's actions and approvals which are at issue in this action transpired in Colorado. [14]

_____

[13]  As I held in my earlier Order on Motion to Dismiss (Doc. 98), SMCRA does not impose a duty to exhaust administrative remedies before seeking judicial review.  Nor are Plaintiffs' claims barred by the issue exhaustion requirement announced by the Supreme Court in *Dept. of Transp. v. Pub. Citizen*,  541 U.S. 752 (2004), as Plaintiffs' allegation of OSM's ongoing pattern and practice of failing to provide adequate public notice constitutes "special circumstances" excusing Plaintiffs' failure to exhaust their administrative remedies before seeking judicial review.  *See infra* at pp. 39-42 for further discussion of OSM's failure to provide adequate public notice.

[14]  Although SMCRA contains a provision providing that venue is proper in the judicial district where the surface coal mining operation is located, that provision only applies when a party seeks judicial review of an order or decision issued in a civil penalty proceeding or proceedings conducted pursuant to 5 U.S.C. § 554.  30 U.S.C. § 1276(a)(2).

### III.  Justiciability

*A.  Standing*

Federal courts are courts of limited jurisdiction; Article III of the Constitution limits their power to resolving "cases" and "controversies."  The standing doctrine reflects this fundamental limitation.  Plaintiffs must "allege[] such a personal stake in the outcome of the controversy as to warrant [their] invocation of federal-court jurisdiction."  *Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1149 (2009).  In order to establish Article III standing, Plaintiffs must assert that: (1) they suffered or imminently will suffer an injury; (2) that injury is fairly traceable to the challenged conduct of Defendants; and (3) a favorable federal court decision is likely to redress the injury.[15]  *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 167 (1997).  Furthermore, where a plaintiff is an organization, that plaintiff-organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 447 n.3 (10th Cir. 1996).  Because the second and third prongs are readily established in this case, my analysis focuses on whether the members of Plaintiff-organizations meet Article III's standing requirements.

*1.  Injury*

Plaintiffs allege that they have established an imminent injury in the form of the environmental harm which would result in injury to their interests, the interests of their staff, and

---

[15]  The Supreme Court has also imposed a variety of prudential standing requirements, none of which is implicated here.

the interests of their members.  They allege Defendants have violated NEPA and seek

declaratory and injunctive relief.  Although generalized harm to the environment alone will not

support standing, "if that harm in fact affects the recreational or even the mere esthetic interests

of the plaintiff, that will suffice."  *Summers*, 129 S. Ct. at 1149.  Furthermore, "when a decision

to which  NEPA obligations attach is made without the informed environmental consideration

that NEPA requires, the harm that NEPA intends to prevent has been suffered."  *Sierra Club v.*

*Marsh*, 872 F.2d 497, 500 (1st Cir. 1989) (Breyer, J.) (quoting *Mass. v. Watt*, 716 F.2d 946, 952

(1st Cir. 1983) (emphasis omitted)).  This is considered harm to the environment because "[t]he

'risk implied by a violation of NEPA is that real environmental harm will occur through

inadequate foresight and deliberation' by the acting federal agency."  *Catron Cty. Bd. of*

*Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1433 (10th Cir. 1996) (quoting *Marsh*, 872

F.2d at 504).  Accordingly, when an agency has failed to comply with the procedural

requirements of NEPA, harm to the environment may be presumed.  *Davis v. Mineta*, 302 F.3d

1104, 1115 (10th Cir. 2002).

Although violation of NEPA's procedural requirements constitutes harm for purposes of

Article III standing, a plaintiff must also show that it is among the injured.  Where a plaintiff is

an organization, that plaintiff-organization must "make specific allegations establishing that at

least one identified member ha[s] suffered or w[ill] suffer harm."  *Summers*, 129 S. Ct. at 1151.

"To demonstrate that the increased risk of harm injures the plaintiff's concrete interests, the

litigant must establish either its 'geographical nexus' to, or actual use of the site where the

agency will take or has taken action such that it may be expected to suffer the environmental

consequences of the action."  *Comm. to Save the Rio Hondo*, 102 F.3d at 449.

9

Plaintiffs submit three declarations in support of their standing in this matter.[16]  The Declarations of Dailan Long (Doc.104-1) and Lucy A. Willie (Doc. 104-2) (members of Diné CARE) and Michael Eisenfeld (Doc. 102-1) (a member of the San Juan Citizens Alliance) allege that they enjoy, and plan to continue to use and enjoy on a regular basis, the natural resources near and directly adjacent to the Navajo Mine and that their present and future interests have been and will continue to be harmed by Defendants' challenged conduct.  Furthermore, these members allege that, as a result of OSM's failure to provide public notice of its 2004 Permit Renewal or 2005 Permit Revision decisions, they were unable to participate meaningfully in the NEPA process. These particularized allegations sufficiently demonstrate the concrete harm caused by Defendants' alleged violations of NEPA as well as the likelihood of future injury resulting from those alleged violations.  *See Wilderness Soc'y v. Kane Cty.*, 581 F.3d 1198, 1211 (10th Cir. 2008) (finding similar declarations sufficient to establish injury in fact).  Plaintiffs have established injury in fact for purposes of Article III standing.

---

[16]  Plaintiffs filed a Motion to Supplement their Opening Brief with the affidavits of Dailan Jake Long and Lucy A. Willie, two Diné C.A.R.E. members, in support of their standing to bring this action.  I granted this motion, but I limited the use of these affidavits, refusing to consider any factual assertions or arguments contained in the declarations which were not contained within the Administrative Record before OSM at the time of its permitting decisions. Minute Order Granting Plaintiffs' Motion to Supplement (Doc. 115).  Although Defendants challenged the admissibility of these declarations for evidentiary purposes, they acquiesce to their admission for purposes of determining Plaintiffs' standing.  Defendants' Answer Brief (Doc. 113) at 2 n.4.  Because I only consider these declarations for purposes of determining Plaintiffs' standing, I do not consider the Declaration of Brenda Steele (Doc. 106-1).  *See* Defendants' Answer Brief (Doc. 113) at 52 n. 21 (urging consideration of the Declaration of Brenda Steele if Plaintiffs' proffered declarations are considered for purposes beyond the standing inquiry).

## 2. Causation

To establish their standing, Plaintiffs must also "show [their] injuries are fairly traceable to the conduct complained of." *Comm. to Save the Rio Hondo*, 102 F.3d at 451. Where a party asserts a NEPA claim, "the injury is the increased risk of environmental harm to concrete interests, and the conduct complained of is the agency's failure to follow the National Environmental Policy Act's procedures." *Id.* Therefore, in order to establish causation, "a plaintiff need only show its increased risk is fairly traceable to the agency's failure to comply with the National Environmental Policy Act." *Id.*

The harm which forms the basis of Plaintiffs' "injury" for purposes of the standing analysis is the "inadequate foresight and deliberation" inherent in OSM's alleged NEPA violations. It logically follows that this injury was directly caused by Defendants' alleged failure to comply with NEPA's procedural requirements. Because they have adequately pled the causal connection between Defendants' complained of conduct and their alleged injuries, Plaintiffs have adequately established causation for purposes of Article III standing.

## 3. Redressability

The redressability prong is met when "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 181 (2000). Where a plaintiff demonstrates a substantial likelihood that compliance with NEPA will redress the claimed injuries, it has sufficiently established "redressability" for purposes of Article III standing. *See Catron Cty. Bd. of Comm'rs*, 75 F.3d at 1433; *S. Utah Wilderness Alliance v. Office of Surface Mining*, *2010 U.S. App. LEXIS 19817* (10th Cir. September 23, 2010) (finding that "redressability" was established where a plaintiff's

11

injury would be redressed by forcing agency to follow proper procedures).

As noted above, Plaintiffs' complained of injuries are directly related to Defendants' alleged failure to comply with NEPA's procedural requirements.  They seek declaratory judgment that Defendants have violated NEPA; a judicial order requiring Defendants to comply with NEPA; an injunction prohibiting the disposal of CCW, the relocation of Navajo Nation tribal members, and blasting operations near tribal members residences until Defendants comply with NEPA in relation to the approval of the 2004 Permit Renewal; an injunction prohibiting mining in Area IV North until Defendants have complied with NEPA in relation to the approval of the 2005 Permit Revision Application; an order requiring Defendants to provide specified public notice and participation under NEPA for permitting actions regarding the Navajo Mine; and, finally, an order requiring Defendants to develop an EIS for the Navajo Mine in its entirety, including the Area IV North expansion.  If I were to grant this requested relief, the alleged NEPA violations would be corrected and Plaintiffs' harms would be redressed.  Plaintiffs have sufficiently demonstrated "redressability" for purposes of Article III standing.

## B. Mootness

Although Plaintiffs have established their standing to bring these claims, I may not address these issues if this case is constitutionally or prudentially moot.  Pursuant to Article III's "case or controversy requirement", a case is constitutionally moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969); *see also Powder River Basin Res. Council v. Babbitt*, 54 F.3d 1477, 1485 (10th Cir. 1995) (when a plaintiff no longer has a personal stake in the outcome, the requirements of a case or controversy under Article III are no longer met).  "An actual

controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1311 (10th Cir. 2010) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)). "In deciding whether a case is moot, the crucial question is whether granting a present determination of the issues offered will have some effect in the real world." *Abdulhaseeb*, 600 F.3d at 1311 (quoting *Kan. Judicial Review v. Stout*, 562 F.3d 1240, 1246 (10th Cir. 2009)). In other words, "When it becomes impossible for a court to grant effective relief, a live controversy ceases to exist, and the case becomes moot." *Id.*

Even if a controversy is not constitutionally moot, it may be prudentially moot where it is "so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant." *Rio Grande Silvery Minnow v. U.S. Bureau of Reclamation*, 601 F.3d 1096, 1121 (10th Cir. 2010) (quoting *Fletcher v. United States*, 116 F.3d 1315, 1321 (10th Cir. 1997)). The doctrine applies primarily in cases involving requests for injunctive or declaratory relief. *See id.* at 1122 (citing *Bldg. & Constr. Dep't v. Rockwell Int'l Corp.* 7 F.3d 1487, 1492 (10th Cir. 1993)). Whether a court applies constitutional or prudential mootness, however, "the central inquiry is essentially the same: have circumstances changed since the beginning of litigation that forestall any occasion for meaningful relief." *Id.*

The mootness of a claim for relief notwithstanding, if a plaintiff seeks multiple forms of relief, "the fact that some of the claims have been rendered moot will not divest the court of jurisdiction to entertain any residual claim that may be viable and on which effective judicial relief may still be granted." 15 Martin H. Redish, Moore's Federal Practice - Civil § 101.100 (2010). With these considerations in mind, I now turn to the actions challenged by Plaintiffs.

13

### 1. 2004 Permit Renewal Decision

Plaintiffs challenge OSM's categorical exclusion of BHP's 2004 Permit Renewal from NEPA analysis. They seek declaratory judgment that OSM violated the APA and NEPA in issuing the 2004 Permit Renewal to BHP and request that I enjoin any aspect of OSM's 2004 permitting action that authorizes relocation of Navajo Nation tribal members, disposal of CCW in the mine permit area, and blasting operations near tribal member residents until such time as OSM has complied with NEPA.

Since Plaintiffs' filing of this complaint, however, the 2004 Permit Renewal has been superseded by a statutorily required 2009 Permit Renewal. Although Plaintiffs assert that OSM failed to cure the complained of defects in its issuance of the 2009 Permit Renewal, the controversy relating to the 2004 Permit Renewal is no longer live.[17] An injunction limiting mining activities pursuant to the 2004 Permit Renewal would be meaningless and a declaratory judgment would be a constitutionally impermissible advisory opinion. Accordingly, I find this portion of Plaintiffs' claim moot.[18]

### 2. 2005 Permit Revision Decision

Plaintiffs also challenge OSM's approval of BHP's 2005 Permit Revision Decision. Specifically, they allege that OSM should have prepared an EIS for this action and, in the

---

[17] Perhaps recognizing this infirmity, Plaintiffs filed a motion to amend their Amended Complaint. In light of the advanced nature of these proceedings, this motion is DENIED.

[18] To the extent Plaintiffs allege OSM failed to provide adequate public notice of its consideration of the 2004 Permit Renewal Application and seek declaratory judgment and an order requiring specified public notice procedures for future NEPA permitting actions, those claims are addressed in relation to the 2005 Permit Revision decision.

alternative, that the EA relied upon was deficient.  They seek declaratory judgment that OSM

violated the APA and NEPA in issuing the 2005 Permit Revision and request that I void OSM's

actions in issuing the 2005 Permit Revision, enjoin implementation of OSM's 2005 permitting

action authorizing expansion in Area IV North until OSM has complied with NEPA, and order

OSM to prepare an EIS for the Navajo Mine in its entirety (including Area IV North).  As part of

their challenge to the sufficiency of the EA, Plaintiffs allege that OSM provided inadequate

public notice as part of the NEPA process relating to the 2005 Permit Revision Application and

seek an order requiring OSM to provide public notice and involvement in all future NEPA

permitting actions relating to the Navajo Mine.  Specifically, they request that OSM be required

to provide notice to all interested parties (including impacted tribal members) and publish notice

of the proposed agency action for 30 days in both tribal and non-tribal periodicals as well as the

Federal Register in English and the Navajo language.

     Unlike the 2004 Permit Renewal, the 2005 Permit Revision was not directly superseded

by the 2009 Permit Renewal.  Although the 2009 Permit Renewal includes the area covered by

OSM's approval of the 2005 Permit Revision Application, it does not, standing alone, provide

sufficient legal basis for the mining operations in Area IV North.[19]  If, as requested by Plaintiffs,

I void OSM's actions in approving BHP's 2005 Permit Revision Application and remand to

Defendants to fulfill their duties under NEPA, there will be real, tangible effects.  Mining

operations in Area IV North will necessarily cease.  Accordingly, Plaintiffs' challenges to the

2005 Permit Revision are not moot.

_____

[19]  As noted *supra* at p. 4, under SMCRA, applications to mine new land areas within an existing permit "shall be subject to the full standards applicable to new applications under [SMCRA]."  30 U.S.C. § 1256(d)(2).

## IV.  Legal Background

### A.  The National Environmental Policy Act

Plaintiffs' challenge is rooted in the National Environmental Policy Act.  Although NEPA contains some substantive mandates,[20] "it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process."  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  These procedural requirements are not merely formalities.  As the Tenth Circuit has noted, "NEPA places upon federal agencies the obligation to consider every significant aspect of the environmental impact of a proposed action. It also ensures that an agency will inform the public that it has considered environmental concerns in its decision-making process."  *Citizens' Comm.  to Save Our Canyons v.  Krueger*, 513 F.3d 1176, 1177-78 (10th Cir.  2008) (internal quotation and citations omitted).

### B.  Standard of Review

NEPA fails to define or specify the standard of review to be used in examining Defendants' actions.  Accordingly, the Administrative Procedure Act, 5 U.S.C. § 500, *et seq.*, provides the framework for this appeal, and I must apply the standards articulated in the APA in considering the merits of Plaintiffs' arguments.

Under the APA, I  review Defendants' actions to determine if they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not

---

[20]  *See* 42 U.S.C. § 4331(a) (The goal of NEPA is "to create and maintain conditions under which man and nature can exist in . . . harmony."); 42 U.S.C. § 4331(b) (It is "the continuing responsibility of the Federal Government to use all practicable means . . . to attain the widest range of beneficial uses of the environment without degradation . . . .")

in accordance with law" if "the agency entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins.* Co., 463 U.S. 29, 41 (1983); *see also Morris v. U.S. Nuclear Reg. Comm'n*, 598 F.3d 677, 690-91 (10th Cir. 2010).

  "A presumption of validity attaches to the agency action and the burden of proof rests with the parties who challenge such action." *Id.* at 691 (quoting *Krueger*, 513 F.3d at 1176).  In the context of NEPA review, courts must "ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." *Krueger*, 513 F.3d at 1178 (citing *Utah Shared Access Alliance v.  U.S. Forest Serv.*, 288 F.3d 1205, 1208 (10th Cir.  2002)).

### C.  NEPA's Procedural Requirements

NEPA's procedural requirements are triggered where a federal agency engages in a "major Federal action[] significantly affecting the quality of the human environment."[21]  42 U.S.C. § 4332(C).  Although NEPA's statutory text specifies <u>when</u> an agency must comply with NEPA's procedural mandate; it is the Council on Environmental Quality ("CEQ") regulations which dictate the <u>how</u>, providing the framework by which all federal agencies comply with NEPA.[22]  According to the CEQ regulations, federal agencies may comply with NEPA by

---

[21]  Neither party contests that Defendants' approval of the 2004 Permit Renewal and 2005 Permit Revision constitute "major Federal actions."  For a definition of this term, *see* 40 C.F.R. § 1508.18.

[22] Congress delegated the responsibility for promulgating regulations implementing NEPA's planning requirements to the CEQ.  *See* 42 U.S.C. §§ 4342, 4344(3); 40 C.F.R. §§ 1501-08.

preparing either an environmental impact statement ("EIS") or an environmental assessment

("EA"), or by applying a categorical exclusion ("CatEx").  *Utah Envtl. Cong.*, 443 F.3d at 736.

An EIS contains an in-depth discussion of the potential impacts a proposal may have

upon the environment, but it is only required where a major federal action may "significantly

affect[] the quality of the human environment."  42 U.S.C. § 4332(2)(C); *see e.g. Middle Rio*

*Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1224 (10th Cir. 2002).  The EIS must

contain a discussion of "the purpose and need for the proposed action, environmental impacts

resulting from the actions, unavoidable adverse environmental impacts, alternatives to the

proposed action, the relationship between short-term uses and long-term productivity, and the

amount of resources that must be devoted to the proposed action."  *Citizens' Comm. to Save Our*

*Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1022 (10th Cir. 2002) (citing 42 U.S.C. §

4332(2)(C)(i)-(v); 40 C.F.R. § 1502.10).  The preparation of an EIS requires a significant

investment of time and resources.  Accordingly, where the environmental impacts of an action

are less certain, an agency may first perform an EA in order to determine whether preparation of

an EIS is required.[23]  40 C.F.R. § 1508.9; *see also Colo. Wild v. U.S. Forest Serv.*, 435 F.3d

1204, 1209 (10th Cir. 2006).

An EA is a public document containing information relating to the need for the proposed

action being considered, other alternatives, the environmental impact of the proposal and its

---

[23]  In fact, there is a noticeable trend towards EAs and away from the more rigorous environmental analysis of an EIS.  According to a CEQ report, "The annual number of draft, revised, supplemental, and final EISs prepared has declined from approximately 2,000 in 1973 to 608 in 1995, averaging 508 annually between 1990-1995. By 1993, a CEQ survey of federal agencies estimated that about 50,000 EAs were being prepared annually." Council on Environmental Quality, The National Environmental Policy Act:  A Study of Its Effectiveness After 25 Years 19 (January 1997).

alternatives, and a listing of agencies and persons consulted.  *See*  40 C.F.R. § 1508.9(b).

Although an EA is less burdensome than an EIS, it still represents a meaningful analysis of the

potential environmental impacts of a proposed action.[24]  When completed, the EA allows the

agency to determine whether the proposed action may have a significant effect on the

environment (requiring an EIS), or that the proposed action will have no significant impact.

*Middle Rio Grande Conservancy Dist.*, 294 F.3d at 1224-25.  In making this determination, the

agency must consider both the context and the intensity of the proposed action. 40 C.F.R. §

1508.27.  Context refers to the scope of the proposed action, including the interests affected.  *Id.*

§ 1508.27(a).  Intensity refers to the severity of impact, and must be evaluated with a host of

factors in mind, including "[u]nique characteristics of the geographic area such as proximity to

historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or

ecologically critical areas" and "[t]he degree to which the action may adversely affect districts,

sites, highways, structures, or objects listed in or eligible for listing in the National Register of

Historic Places or may cause loss or destruction of significant scientific, cultural, or historical

resources."  *Id.* § 1508.27(b).

    If the EA concludes that an EIS is not required, the agency must publish a finding of no

significant impact ("FONSI").  The FONSI presents "the reasons why an action, not otherwise

excluded, will not have a significant effect on the human environment and for which an

---

[24]  According to the NEPA Task Force, minimum level EAs "typically:  range from 10 to
30 pages in length; are developed by one author; require from 2 weeks to 2 months to complete;
and cost between $5,000 and $20,000."  The NEPA Task Force, Report to the Council on
Environmental Quality; Modernizing NEPA Implementation 65 (Sept. 2003).  By comparison,
larger EAs "typically:  range from 50 to more than 200 pages in length; are developed by an
interdisciplinary team; require from 9 to 18 months to complete; and cost between $50,000 and
$200,000."  *Id.*

environmental impact statement therefore will not be prepared." *Id.* § 1508.13.  It must include

the underlying EA or a summary of it and note any other environmental documents related to it.

*Id.*

In certain limited circumstances an agency may categorically exclude from

environmental review a class of actions which do not "individually or cumulatively have a

significant effect on the human environment."  40 C.F.R. § 1508.4.  Where an agency action falls

within a CatEx, an agency need not prepare an EIS or an EA.

The responsibility for designating CatEx's is delegated to individual federal agencies.  40

C.F.R. § 1507.3(b)(2)(ii) (requiring agencies to set "specific criteria" for what actions "normally

do not require either an environmental impact statement or an environmental assessment").  In

order to establish a CatEx, an agency must first publish it in the Federal Register, provide

opportunity for public comment, and submit the CatEx to the Council for Environmental Quality

("CEQ") for review.  40 C.F.R. § 1507.3(a).  Because CatEx's are published in the Federal

Register and are subject to public comment and review, courts treat them as agency regulations.

*Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1023 n.8.  Thus, once an agency has

established a CatEx, "its decision to classify a proposed action as falling within a particular

categorical exclusion will be set aside only if a court determines that the decision was arbitrary

and capricious."  *Id.* at 1023.

### V.  Discussion and Analysis

#### A.  The Categorical Exclusion for the September 2004 Permit Renewal

As discussed above, Plaintiffs' challenges to OSM's approval of the 2004 Permit

Renewal decision have been mooted by OSM's issuance of a superseding 2009 Permit Renewal.

20

Accordingly, I do not address Plaintiffs' arguments.  If Plaintiffs wish to challenge the usage of a categorical exclusion in the context of the 2009 Permit Renewal decision, they must do so in a different action.

### B.  The Environmental Assessment of BHP's 2005 Permit Revision Application

Plaintiffs argue that Defendants failed to comply with NEPA's procedural requirements in approving BHP's 2005 Permit Revision Application.  Specifically, Plaintiffs argue Defendants should have completed an EIS before approving BHP's 2005 Permit Revision Application; the EA completed by Defendants was deficient; and Defendants should have completed a Supplemental EA or EIS.

### 1.  EIS Required [25]

Plaintiffs urge that BHP's proposal to expand its mining operations by 3,800 acres will significantly affect the quality of the human environment, and, accordingly, OSM should have conducted an EIS before approving BHP's 2005 Permit Revision Application.  In reviewing the 2005 Permit Revision EA/FONSI to determine whether an EIS should have been prepared, I must determine whether OSM acted arbitrarily and capriciously in concluding that the proposed action "will not have a significant effect on the human environment."  This review has both a substantive and procedural component.  *See Davis*, 302 F. 3d at 1112.  "If the plaintiffs can demonstrate substantively that the [agency's] conclusion of non-significant effect on the environment represents a 'clear error of judgment,' then that conclusion must be reversed."  *Id.*

---

[25]  For ease of reference, in structuring my opinion I have adopted the organization used by Plaintiffs in their Opening Brief.  In the section discussing the 2005 Permit Revision, however, Plaintiffs' arguments are not easily compartmentalized and oftentimes overlap between different sections.  Where appropriate, I have combined and arranged my discussion to avoid redundancy and confusion.

(quoting *Utah Shared Access Alliance*, 288 F.3d at 1213).

According to Plaintiffs, OSM guidelines required preparation of an EIS for BHP's 2005 Permit Revision Application, and OSM's failure to do so is "arbitrary, capricious, or otherwise not in accordance with law."[26]   The OSM guidelines at issue stipulate that an EIS will normally be prepared for the approval of a proposed mining and reclamation plan where:

> (a)  The environmental impacts of the proposed mining operation are not adequately analyzed in an earlier environmental document covering the specific leases or mining activity; and
> (b)  The area to be mined is 1280 acres or more . . .; and
> (c)  Mining and reclamation operations will occur for 15 years or more.

DOI Departmental Manual, 516 DM 13.4(A)(4).[27]   Neither party contests that the proposed mining operation in the Permit Revision exceeds 1280 acres or will occur for fifteen years or more;[28] instead, they contest whether earlier environmental documents adequately analyze the environmental impacts of mining in Area IV North.

Although the provisions at issue in this case are guidelines, they were promulgated pursuant to notice and comment rulemaking.  They are therefore treated as regulations for

---

[26]  Plaintiffs also argue that OSM failed to evaluate either the individual or cumulative impacts of BHP's expanded Area IV North operations upon tribal members and their customary rights and that the EA "lacks any discussion of mitigation or impacts to scientific, historic, or cultural resources known to exist in Area IV North."  These arguments are discussed *infra* at pp. 32-37.

[27]  These guidelines were promulgated pursuant to 40 C.F.R. § 1507.3(b)(2)(i), which requires an agency to adopt procedures including, among other things, "[s]pecific criteria for and identification of those typical classes of action:  (i) [w]hich normally do require environmental impact statements."

[28]  As discussed above, although SMCRA limits the permit revision to a length of five years, BHP could, and likely would, seek renewal as a matter of right upon the permit's expiration.  By way of illustration, mining in other parts of the Navajo Mine have been ongoing for over fifty years.

purposes of my review, and OSM's interpretation and application of them is due substantial deference.  Even when such  deference is appropriate, however, an agency's interpretation of its own regulations must be rejected when "plainly erroneous or inconsistent with the regulation." *Mission Group Kan. v. Riley*, 146 F.3d 775, 780 (10th Cir. 1998).

The plain language of the guidelines at issue in this case makes clear that only environmental documents which "cover[] the <u>specific</u> leases or mining activity" at issue in the proposed mining operation can form the basis for a determination that an EIS is not normally required.  DOI Departmental Manual, 516 DM 13.4 (emphasis added).  "Specific" is an adjective denoting a "precise formulation or accurate restriction."  Webster's Third New International Dictionary 2187 (1976).  Thus, according to its own guidelines, only those environmental documents which contain a discussion of the precise area to be impacted by the proposed mining area are relevant in determining whether an EIS will normally be required.

The explanation provided at the time of promulgation further justifies a limited interpretation of 13.4(A)(4)(a).  This provision was added to clarify the fact that "[i]t is not [OSM's] intent to prepare an EIS for mining and reclamation plans when the impacts are adequately covered in an EIS at an earlier stage (e.g., leasing)."  National Environmental Policy Act; Revised Implementing Procedures, 46 Fed. Reg. 7487, 7488 (Jan. 23, 1981).  This language suggests that OSM only intended to rely upon earlier environmental analyses where they addressed "a period or step in a process, activity, or development," or, more specifically, "one of two or more operations performed at different times but constituting a single procedure." Webster's Third New International Dictionary 2219 (1976) (defining "stage").  In other words, this guideline mirrors what is commonly referred to as "tiering" in the NEPA lexicon.

Defendants relied upon three EIS's (WESCO EIS, AR 28-1; Four Corners EIS, AR 29-1; and San Juan River Regional Coal EIS, AR 30-1, 30-132 to 239) and five EA's (1989 Navajo Mine EA, AR 31-1; 1991 Navajo Mine EA, AR 33-1; 1993 Navajo Mine EA, AR 35-1; 2000 Navajo Mine EA, AR 37-1; and 2001 Navajo Mine EA, AR 39-1) in determining that an EIS was not required.  The WESCO EIS was prepared in 1976 by the Bureau of Reclamation in response to an application to construct and operate four coal gasification plants and the necessary support facilities.  Among other issues, the EIS considered the impacts of expansions to the then-existing Navajo Mine, because those expansions would provide the coal for the project.  *See* AR 28-55 to 28-86.  These expansions were to occur in the southern portion of BHP's lease area, including a small portion of Area IV North.  The Four Corners EIS was prepared by the Bureau of Reclamation in 1976, and addressed a variety of proposed revisions to the Four Corners Powerplant, as well as a proposed revision to the Navajo Mine. The San Juan River Regional Coal EIS was prepared in 1984 by the Bureau of Land Management in connection with anticipated coal leasing and development on non-tribal federal lands in San Juan, McKinley, Valencia, and Sandoval Counties in northwest New Mexico.  The five cited EA's address the impacts of mining in other portions of the Navajo Mine.

Of these EISs and EAs, only the WESCO EIS contains any discussion and analysis of mining in Area IV North.[29]  This relevant discussion is, however, confined to the impacts of

---

[29] The WESCO EIS discusses, among other things:  the existing human environment, *see* AR 28-131 to 28-335; the anticipated environmental impacts of the proposed activities, *see* AR 28-336 to 28-574; and proposed mitigation measures, *see* AR 28-575 to 28-598.

mining in only a small portion of Area IV North.[30]  *See* AR 28-51; 28-56. This does not

constitute adequate analysis of the <u>specific</u> mining activity proposed in BHP's 2005 Permit

Revision Application.  As a result, the cited EISs and EAs fail to adequately analyze the specific

mining activity proposed in BHP's 2005 Permit Revision Application.  Furthermore, none of the

cited EIS's were conducted as part of a tiered NEPA analysis.[31]  In light of the plain meaning of

OSM's guidelines, approval of the 2005 Permit Revision Application is a type of action for

which an EIS is normally prepared.

Nevertheless, because these guidelines do not require preparation of an EIS, Defendants

were not necessarily "arbitrary and capricious" in conducting an EA and issuing a FONSI for

BHP's 2005 Permit Revision Application.  516 DM 13.4; *see also* National Environmental

Policy Act; Revised Implementing Procedures, 46 Fed. Reg. 7487, 7487 (1981).  This guideline

does, however, create a presumption that an EIS will normally be prepared, and Defendants bear

the burden of establishing why that presumption should not apply in this particular case.  *See*

*Davis*, 302 F.3d at 1117.

Defendants erroneously determined this was not the type of action for which an EIS

would normally be required.  As a result, they fail to establish why the presumption does not

apply to BHP's 2005 Permit Revision Application. In light of this failure, I could require

Defendant OSM to prepare an EIS.  I think it most appropriate, however, to remand to OSM to

---

[30]  Although it is difficult to discern from the information in the record, the WESCO EIS
appears to analyze approximately 950 acres, or 25%, of BHP's proposed expansion into Area IV
North.

[31]  Although the 1989 EA arguably forms the basis of a tiered analysis, it contains no
discussion of the impacts of mining in Area IV North.

provide it an opportunity to reassess its position in light of this ruling.  OSM should be especially mindful of the context and intensity of the proposed 2005 Permit Revision in determining whether it may significantly affect the environment and require preparation of an EIS.

### 2.  The EA Was Deficient

Plaintiffs also argue that the EA prepared by Defendants failed to adequately analyze the environmental impacts associated with the approval of BHP's 2005 Permit Revision Application.

### a.  Failure to Analyze Connected Actions

Plaintiffs assert that Defendants' failure to consider connected actions in its EA for BHP's proposed permit revision violates NEPA and is arbitrary, capricious, an abuse of discretion, and contrary to law.  While the CEQ regulations do not specifically address how an agency is to determine the appropriate scope of an EA, some guidance may be found in the provisions relating to the scope of an EIS.[32]

In order to allow for a meaningful discussion of the potential environmental effects of a proposed action, the CEQ regulations require agencies to consider all "connected actions" in a single EIS.   "Connected actions" are defined as actions that are "closely related" to the action under review because the actions:

(i)  Automatically trigger other actions which may require environmental impact

---

[32]  This conclusion logically follows from the fact that the EA forms the basis for determining whether an EIS is or is not necessary.  If an EA is to serve this purpose, it must be similar in scope to the potential EIS.  *See Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1028 n.13; *see also Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 998 (9th Cir. 2004) (finding that "the CEQ regulations implementing NEPA require that an agency consider connected actions and cumulative actions within a single <u>EA or EIS</u>." (emphasis in original) (quotations omitted)).

statements.
(ii)  Cannot or will not proceed unless other actions are taken previously or simultaneously.
(iii)  Are interdependent parts of a larger action and depend on the larger action for their justification.

40 C.F.R. § 1508.25(a)(1).  As the Tenth Circuit has recognized, "One of the primary reasons for requiring an agency to evaluate 'connected actions' in a single EIS is to prevent agencies from minimizing the potential environmental consequences of a proposed action (and thus short-circuiting NEPA review) by segmenting or isolating an individual action that, by itself, may not have a significant environmental impact."  *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1028.  Thus, courts often find actions to be connected where one action <u>could</u> not occur without the other.  *Id.* at 1029.

Conversely, projects which have "independent utility" are not "connected actions." *Utahns v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1183 (10th Cir. 2002).  The crux of the "independent utility" determination is "whether each of two projects <u>would</u> have taken place with or without the other . . . ."  *Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1229 (10th Cir. 2008) (emphasis added) (quoting *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006)).

Although, there appears to be some tension in the 10th Circuit's inconsistent usage of the terms "could" and "would" in determining whether an action is "connected" for purposes of NEPA analysis, the regulations make clear than an action is connected if it "[c]annot <u>or</u> will not proceed unless other actions are taken simultaneously."  40 C.F.R. § 1508.25(a)(1)(ii) (emphasis added).  Thus, even though an action could conceivably occur without the previous or simultaneous occurrence of another action, if it would not occur without such action it is a

"connected action" and must be considered within the same NEPA document as the underlying action.

Plaintiffs allege Defendants improperly failed to analyze the effects of the Burnham Road relocation in the 2005 Permit Revision EA.[33][34]  As the 2005 Permit Revision EA states, without approval of the 2005 Permit Revision Application, "The Burnham Road would not be moved and improved and the 50 additional acres would not be disturbed."  AR 14-26 (emphasis added).  The Burnham Road Relocation lacks independent utility.  It is, therefore, a connected action which should have been, but was not, analyzed in the 2005 Permit Revision EA.  Defendants' failure to do so constitutes a violation of NEPA.  On remand, Defendant OSM shall consider the environmental effects of the Burnham Road Realignment in connection with its analysis of BHP's 2005 Permit Revision Application.

### b. Failure to Consider Reasonable Range of Alternatives

Plaintiffs next contend that Defendants failed to consider a reasonable range of alternatives in the EA in violation of NEPA.

The obligation to consider alternatives to the proposed action is at the heart of the NEPA process, and is "operative even if the agency finds no significant environmental impact."

---

[33]  Plaintiffs also challenge Defendants' failure to consider the impacts of its adoption of the ethnographic study and mitigation plan required in BHP's 2005 Permit Revision Application.  The ethnographic study and the mitigation plan were not completed at the time of the permit revision EA, so OSM could not have considered them as connected actions.  These challenges are considered *infra* at pp. 34-37 in relation to Plaintiffs' argument that Defendants failed to discuss mitigation of impacts on scientific, historic, or cultural resources at Area IV North and *infra* at pp. 42-45 in relation to Plaintiffs' argument that, in light of the completion of the ethnographic study and mitigation plan, OSM should have completed a Supplemental EA.

[34]  Defendants fail to address this argument in their Answer Brief.

*Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1277 (10th Cir. 2004) (quoting *Highway J Citizens Group v. Mineta*, 349 F.3d 938, 960 (7th Cir. 2003)). In formulating an EA, an agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1508.9(b). An agency need only study reasonable alternatives, however, not those which are "remote, speculative . . . , impractical, or ineffective [sic]." *Davis*, 302 F.3d at 1121.

Reviewing courts measure the reasonableness of alternatives against two guideposts. "First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate. Second, reasonableness is judged with reference to an agency's objectives for a particular project." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 709 (10th Cir. 2009) (citation omitted). The agency may not, however, "define the project so narrowly that it foreclose[s] a reasonable consideration of alternatives [sic]." *Utah Envtl. Cong.*, 439 F.3d at 1195 (quoting *Davis*, 302 F.3d at 1119).

As stated in the purpose and need statement in the EA for the 2005 Permit Revision, Defendants' action was triggered by their statutory duty to decide whether to approve or disapprove BHP's 2005 Permit Revision Application. 2005 Permit Revision EA, AR 14-15. This purpose and need statement is reasonable in light of OSM's statutory responsibilities. Consistent with this purpose and need, Defendants considered in depth two alternatives in the 2005 Permit Revision EA: approval and disapproval of the 2005 Permit Revision Application.[35]

---

[35] OSM also briefly considered but properly dismissed two statutorily required alternatives.

These alternatives are reasonable in light of the underlying purpose and need.  They are not, however, reasonable in light of the scope of OSM's statutory authority and its actions in relation to the approval of the 2005 Permit Revision Application.

Pursuant to the regulations implementing SMCRA, Defendants had three possible courses of action upon receipt of BHP's 2005 Permit Revision Application:  approval, approval with conditions, and disapproval.  30 C.F.R. § 773.7; *see also Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 346 (6th Cir. 2006).  As noted above, Defendants considered only alternatives that would approve or disapprove the 2005 Permit Revision in their EA.  Even more troubling, despite its failure to consider explicitly the approval with conditions alternative or alternatives, such an alternative was actually adopted. Defendants argue that, although "the environmental assessment could have been much clearer and could have been crafted differently," the "administrative record reflects that effectively there was a third alternative" because "the decision notice effectively sets forth what it was that, that [sic] was considered and was adopted."[36]  Transcript of Oral Argument at 35-36.

I recognize the danger of a slavish, overly formalistic adherence to legal requirements. If, in effect, Defendants considered this third alternative and reached the substantively same result, it would seem as if there is no true harm.  NEPA, however, is a unique statute which elevates form over substance, focusing not on the outcome of a decision, but on the procedure followed in reaching it.  *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 737 (1998).  It is

---

[36]  I note that there is little support for this argument in the administrative record. Because I find Defendants' position improper even in light of this stated rationale, I do not determine whether this constitutes an impermissible *post hoc* rationalization for an otherwise improper action.  *See, e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-13 (1988).

irrelevant whether a decision notice includes a discussion (either explicit or implicit) of an alternative.  An agency must meaningfully consider and discuss alternatives in the process of reaching a decision. *C.f.* 40 C.F.R. § 1502.14 (describing the discussion of alternatives in an EIS and noting that it "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public"); *Or. Natural Desert Ass'n v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1114, 1121 (9th Cir. 2008) (quoting 40 C.F.R. § 1502.14) (In the alternatives analysis, the agency must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated").  Once the decision has been made without meaningful consideration of a reasonable alternative, the harm envisioned by NEPA has been done.

Furthermore, even if an EA effectively includes consideration of an alternative such that the agency has considered it in the decisionmaking process, NEPA demands more.  One of NEPA's core purposes is to ensure "that an agency will inform the public that it has considered environmental concerns in its decision-making process."  *Krueger*, 513 F.3d at 1177-78 (citing *Utah Shared Access Alliance*, 288 F.3d at 1207).  A party reviewing an EA should not be forced to read between the lines to determine whether the agency has considered a reasonable alternative.

It bears repeating that the obligation to consider alternatives is at the heart of the NEPA process.  By their own admission, Defendants "effectively" considered three alternatives, but

only explicitly considered two alternatives.[37]  They may not fulfill their responsibility to consider reasonable alternatives meaningfully by "effectively" including an alternative in either the decision notice or the EA, especially where they adopted an alternative which was not explicitly considered.  The existence of a viable but unexamined alternative renders an alternatives analysis, and the EA which relies upon it, inadequate.  *Cf. Or. Natural Desert Ass'n*, 514 F.3d at 1121.  Contrary to one of NEPA's primary purposes, the 2005 Permit Revision EA does not ensure the public that all reasonable alternatives were meaningfully studied, developed, and described.  On remand, Defendants shall include a meaningful discussion of all reasonable alternatives – including approval with conditions.[38]

### c.  Failure to Take a "Hard Look"

Plaintiffs also argue that, in the EA of BHP's proposed mine expansion, Defendants failed to take a "hard look" at impacts on Navajo Nation tribal members and the impact of continued permanent CCW disposal and use of CCW as minefill in the Navajo mine.  They also argue that Defendants have failed to evaluate the means by which they will mitigate direct, indirect, or cumulative impacts to tribal members and their rights; scientific, historic, or cultural resources; and CCW disposal.

---

[37]  It is debatable whether Defendants even "effectively considered" a third alternative in the manner required by NEPA and the implementing CEQ regulations.  There is scant evidence in the EA or the Administrative Record that Defendants engaged in a meaningful comparative analysis of their chosen course of action with their explicitly considered alternatives.

[38]  I do not address the scope of conditions which Defendants could reasonably consider in approving a permit application.  Defendants should, however, be mindful that the duty to consider all reasonable alternatives in the EA includes a duty to consider a reasonable scope of conditions which may be imposed consistent with the purpose and need of the project and its statutory authority.  By way of reference, Defendants should refer to the detailed discussion of conditions in OSM's 1991 Navajo Mine EA.  *See* AR 33-13 to 33-27.

In order to comply with NEPA's "hard look" requirement, the 2005 Permit Revision EA "must not only reflect the agency's thoughtful and probing reflection of the possible impacts associated with the proposed project, but also provide a reviewing court with the necessary factual specificity to conduct its review." *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 781 (10th Cir. 2006) (quoting *Comm. to Pres. Boomer Lake Park v. U.S. Dep't of Transp.*, 4 F.3d 1543, 1553 (10th Cir. 1993)).  As the regulations make clear, however, an EA is not conducted in a vacuum.  Where a broad environmental impact statement has been prepared on an entire program or policy, an EA prepared for an action within the scope of the already analyzed program or policy  "need only summarize the issues . . . and shall concentrate on the issues specific to the subsequent action."  40 C.F.R. § 1502.20.

### i.  Failure to Evaluate Impacts on Customary Rights or their Mitigation

BHP's expansion into Area IV North will impact numerous customary use rights held by tribal members.  *See* AR 03-3, 03-4.  Plaintiffs argue that OSM has failed to "evaluate how or by what means direct, indirect, or cumulative impacts to tribal members and their rights will be mitigated."  Plaintiffs' Opening Brief (Doc. 102) at 20.  Defendants argue that "the Navajo Nation and BIA have extensively studied the issue of relocation."  Defendants' Answer Brief (Doc. 111) at 55.  Further, Defendants assert that the authority to review and approve the agreements negotiated between BHP and the affected holders of such customary use rights is vested exclusively in the Navajo Nation.  *See* Navajo Nation Code tit. 16, §§ 1401-1403.

Plaintiffs counter, arguing that the studies upon which Defendants rely are outdated and immaterial.  I acknowledge that it stretches the limits of rationality to believe that these issues are adequately addressed in the Four Corners Power Plant FEIS, published in 1976, and the San

Juan River Regional Coal EIS, published in 1984.  Nonetheless, although this FEIS and EIS are somewhat dated and fail to specifically address the area to be mined in Area IV North, they do analyze relocation related to previous expansions at mines in the region, including the Navajo Mine.  Plaintiffs' sweeping assertions are insufficient to meet their burden of showing that Defendants' reliance upon the FEIS and EIS is either arbitrary or capricious.

Plaintiffs also assert that the Navajo Tribal Code does not preclude OSM's analysis of the issue.  Even if this contention is correct, however, I find OSM's deference to the conditions and mitigation measures the Navajo Nation, with the approval of BIA, negotiated and approved is neither arbitrary nor capricious.  As Defendants note, "the Navajo Nation has reserved for itself the right to approve relocation compensation agreements negotiated between mining companies and those who claim (and prove) that they have rights upon the land (e.g. to live there or to graze there)."  Defendants' Response Brief (Doc. 113) at 40.  Plaintiffs have failed to show that Defendant OSM failed adequately to evaluate the impacts of its approval of BHP's 2005 Permit Revision Application on tribal members and their rights.

ii.  *Failure to Discuss Mitigation of Impacts on Scientific, Historic, or Cultural Resources*

Plaintiffs also argue that OSM failed to discuss mitigation of impacts to scientific, historic, or cultural resources known to exist in Area IV North in its EA of BHP's proposed mine expansion.  Defendants deny this argument, citing the pending ethnographic study and mitigation measures required as a condition of their approval of BHP's 2005 Permit Revision Application as evidence of their consideration of these resources.  Plaintiffs counter, arguing that the mitigation measures included in OSM's decision document cannot be relied upon for purposes of the FONSI, because they were not mandatory and they were not finalized at the time the FONSI

was made.

As noted in the 2005 Permit Revision Decision Document, seventy-three significant historical and cultural sites will be affected by the expansion of BHP's mining operations, thirty-four of which are considered eligible for nomination to the National Register of Historic Places. AR 14-70.  Pursuant to NEPA, OSM was required to analyze the effects of BHP's proposed permit revision on these resources before reaching a final decision.   Indeed, OSM was required to consider the degree to which approval of the 2005 Permit Revision would adversely affect these resources in determining whether an EIS was required.  *See* 40 C.F.R. § 1508.27(b). Although these effects may have been significant, OSM determined that any effects would be mitigated by "mitigation/data recovery plans" to be developed by BHP pursuant to a permit condition.  These mitigation/data recovery plans were essential to OSM's finding of no significant impact.

The CEQ regulations require an agency to include a discussion of possible mitigation measures in an EIS.[39]  *See* 40 C.F.R. § 1508.25(b)(3), § 1502.14(f), § 1502.16(h), and § 1505.2(c); *see also Robertson*, 490 U.S. at 351-52.  Although an agency need not fully develop a mitigation plan which will mitigate any environmental harm before it can act, *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1522 (10th Cir. 1992), it must include a "reasonably complete [discussion of mitigation measures] in order to properly evaluate the severity of the adverse effects of a proposed project before making a final decision."  *Colo.*

---

[39]  As discussed *supra* at n. 32, although the regulations do not specifically address the scope of an EA, the requirements for an EIS are informative.  Although an agency need not analyze mitigation measures as thoroughly in an EA as it would in an EIS, it should include sufficient discussion and analysis to allow the public or a reviewing court to evaluate the adequacy of proposed mitigation measures.

*Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1173 (10th Cir. 1999) (citing *Robertson*, 490 U.S. at

352).  "[A] perfunctory description or mere listing of mitigation measures, without supporting

analytical data, is not sufficient to support a finding of no significant impact." *San Luis Valley*

*Ecosystem Council v. U.S. Fish and Wildlife Serv.*, 657 F. Supp. 2d 1233, 1245 (D. Colo. 2009)

(citing *Nat'l Parks & Conservation Assoc. v. Babbitt*, 241 F.3d 722, 734 (9th Cir. 2001); *see also*

*Colo. Envtl. Coal.*, 185 F.3d at 1173 (citing *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,

137 F.3d 1372, 1380 (9th cir. 1998))  (holding that "it is not enough to merely list possible

mitigation measures").  Furthermore, as the Tenth Circuit has held, "[m]itigation measures may

be relied upon to make a finding of no significant impact only if they are imposed by statute or

regulation, or submitted by an applicant or agency as part of the original proposal." *Davis*, 302

F.3d at 1125.

   Although the mitigation measures relating to the preservation of scientific, historic, and

cultural resources may be relied upon because they are imposed by a variety of statutory and

regulatory regimes,[40] the lack of detail as to the nature of the mitigation measures considered in

reaching the finding of no significant impact precludes any meaningful judicial review.  The

---

[40]  These resources are protected by the mandatory provisions of the National Historic
Preservation Act, 16 U.S.C. § 470 *et seq.*, and the Navajo Nation Cultural Resources Protection
Act, AR 58-3.  Furthermore, the Programmatic Agreement for the Navajo Mine requires BHP to
comply with the:  (1) Navajo Nation Policy for Protections of Jishchaá:  Gravesites, Human
Remains, and Funerary Items; (2) the Native Americans Grave Protection and Repatriation Act
of 1990 ("NAGPRA"), 25 U.S.C. § 3001 *et seq.*; and (3) the regulations implementing
NAGPRA, 43 C.F.R. part 10. AR 58-4. Plaintiffs allege that Defendants' citation to these
statutory regimes is a *post hoc* rationalization for OSM's decision.  Although the EA and
decision document could have more clearly cited these statutory and regulatory regimes, they do
contain some reference to them.  *See* AR 14-11 (noting the presence within Area IV North of
thirty-four sites eligible for nomination to the National Register for Historic Places as well as
several Traditional Cultural Properties including burials).

permit revision decision document contains only vague reference to "mitigation/data recovery plans" which will be conducted by BHP before commencing any mining activity in Area IV North.  *See* 2005 Permit Revision Decision Document at 14-2, 14-11, 14-13, 14-24, 14-45, and 14-70 (referring to "mitigation/data recovery plans" which BHP must implement before mining in Area IV North).  Indeed, because the mitigation/data recovery plans were to be developed as a condition of OSM's approval of the 2005 Permit Revision Application, there were no detailed mitigation plans upon which OSM could have relied in making its finding of no significant impact.[41]  Its reliance on hypothetical mitigation measures is arbitrary and capricious.

I find that OSM failed to take the requisite "hard look" at the mitigation of impacts on scientific, cultural, and historical resources in Area IV North.  On remand, OSM must consider the specific mitigation measures proposed in the ethnographic studies in determining the severity of the effects that BHP's 2005 Permit Revision Application will have on scientific, historic, and cultural resources in Area IV North.

### iii.  Failure to Evaluate Impacts of CCW

Plaintiffs also argue that the 2005 Permit Revision EA failed to take a "hard look" at the impact of continued permanent CCW disposal and use of CCW as minefill at the Navajo Mine.  Defendants argue Plaintiffs have failed to cite any evidence in either BHP's permit application or the Administrative Record that BHP has applied for or OSM has approved of the disposal of CCW in Area IV North.  Plaintiffs do not dispute this deficiency, but counter that it was

---

[41]  The 2005 Permit Revision FONSI was issued on October 5, 2007 – twenty-one months before the Ethnographic Studies were completed and two years before the Programmatic Agreement incorporating these studies was finalized.  *See* 2005 Permit Revision Decision Document, AR 26-1; Area IV North Ethnographic Study, AR 74-1; and OSM Programmatic Approval Letter, AR 57-1.

impossible for them to do so because Defendants failed to include BHP's revision permit application in the agency's Administrative Record.

In order to ensure meaningful judicial review of agency action, the administrative record must contain "all documents and materials directly or indirectly considered by the agency." *Bar MK Ranches v. Yeutter*, 994 F.2d. 735, 739 (10th Cir. 1993). Consistent with the deference owed an agency under APA, 5 U.S.C. § 706, I assume that the agency properly designated its record absent clear evidence to the contrary. *Bar MK Ranches*, 994 F.2d at 740.

As Defendants have acknowledged, however, the absence of the 2005 Permit Revision Application from the Administrative Record is inexplicable. Indeed it is the result of a clerical oversight in the compilation of the administrative record. Ideally the parties would have resolved this discrepancy earlier in the proceedings. I cannot, however, engage in a meaningful review of OSM's actions if I am unable to determine whether the permit revision allows for the usage of CCW as part of BHP's reclamation plan. Furthermore, although OSM cites a previous study addressing the usage of CCW as part of the reclamation plans at the Navajo Mine, I cannot evaluate the extent to which any potential use of CCW as part of the reclamation plan for Area IV North is adequately addressed by that previous study.

When the agency record is inadequate, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Sierra Club-Black Hills Group v. U.S. Forest Serv.*, 259 F.3d 1281, 1289 (10th Cir. 2001) (quoting *Fla. Power & Light Co.*, 470 U.S. at 744). Although Defendants have supplemented the Administrative Record with the 2005 Permit Revision Application, I decline to require the parties to re-brief this issue at this late stage of the proceedings. Because I am vacating OSM's approval of the 2005 Permit

Revision Application and remanding the 2005 Permit Revision EA to OSM for further

consideration and analysis, it is most appropriate to remand the administrative record to OSM.

OSM shall include a discussion of CCW to the extent it is mentioned, if at all, in the 2005 Permit

Revision Application in its revised EA for  BHP's 2005 Permit Revision Application.

### 4.  Failure to Involve Public

Plaintiffs next argue that OSM failed to provide public notice of the availability of

OSM's FONSI/EA and violated NEPA by denying the public the ability to review and comment

on the FONSI/EA.  As reflected in the CEQ regulations, one of NEPA's primary purposes is to

"insure that environmental information is available to public officials and citizens before

decisions are made and before actions are taken."  40 C.F.R. § 1500.1(b).  As the Supreme Court

has recognized, when properly implemented, NEPA procedures "ensure[] that the agency will

inform the public that it has indeed considered environmental concerns in its decisionmaking

process."  *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983); *see also S.*

*Utah Wilderness Alliance v. Norton*, 301 F.3d 1217, 1237 (10th Cir. 2002), *rev'd* and *remanded*

on other grounds, 542 U.S. 55 (2004).  Accordingly, the CEQ regulations require agencies to,

among other responsibilities,  "[m]ake diligent efforts to involve the public in preparing and

implementing their NEPA procedures," 40 C.F.R. § 1506.6(a); "[p]rovide public notice of

NEPA-related hearings, public meetings, and the availability of environmental documents so as

to inform those persons and agencies who may be interested or affected," *id.* § 1506.6(b);

"[s]olicit appropriate information from the public," *id.* §  1506.6(d); and "[e]xplain in its

procedures where interested persons can get information or status reports on environmental

impact statements and other elements of the NEPA process" *id.*  §  1506.6(e).  Additionally, the

CEQ Regulations require agencies preparing an EIS to make an initial draft available for public comment and to consider "develop[ing] and evaluating alternatives not previously given serious consideration" in response to comments. 40 C.F.R. §§ 1503.1, 1503.4. "[T]he broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989).

"NEPA's public involvement requirements are not as well defined when an agency prepares only an EA and not an EIS." *Greater Yellowstone Coal.*, 359 F.3d at 1279. Although the CEQ Regulations require agencies to "involve . . . the public, to the extent practicable, in preparing [EAs]," they only require an agency to circulate a FONSI before making the final determination of whether to prepare an EIS in certain limited circumstances. 40 C.F.R. § 1501.4(b). Based on the plain meaning of these regulations, it is apparent that circulation of a draft EA is not required in every case. It is required, however, where an action normally requires the preparation of an environmental impact statement but an agency makes a finding of no significant impact. *Id.* § 1501.4(e)(2)(i). In such cases, "the agency shall make the finding of no significant impact available for public review (including State and areawide clearinghouses) for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin." 40 C.F.R. § 1501.4(e)(2); DOI Departmental Manual, 516 DM 13.4. As discussed above, the Defendants' approval of the 2005 Permit Revision Application was a type of action for which an EIS would normally be prepared. Defendants failed, however, to make the 2005 Permit Revision FONSI available for public review before making the final determination. Their actions are not in accordance with law.

40

Accordingly, on remand, if OSM determines that an EIS is not required for its approval of BHP's 2005 Permit Revision Application, it must make its FONSI available for public review for 30 days before making its final determination.

Mere publication of the FONSI is not, however, sufficient.  In this regard, it is necessary to examine the sufficiency of the public notice procedures employed by OSM in advance of its approval of the 2005 Permit Revision Application.

Before approving BHP's 2005 Permit Revision Application, OSM published notice of BHP's permit revision application in the *Farmington Daily Times*[42] and mailed notifications to federal, state, and tribal governmental agencies informing them of BHP's proposal and inviting comments on the revision application.  Plaintiffs argue that this public notice was inadequate. Specifically, Plaintiffs note that a majority of the people affected by the permit revision are members of the Navajo Nation.  According to Plaintiffs, the primary news source in the community is tribal radio, not the *Farmington Daily Times*.  Also of note, many area residents speak English, if at all, as a second language.[43]

Adequate notice requires a meaningful effort to provide information to the public affected by an agency's actions.  As Plaintiffs note, the population most affected by OSM's

---

[42]  This notice was published for four consecutive weeks and provided information on the location and acreage proposed for the revision and where the revision application was available for public inspection.  The notice invited interested parties to submit written comments or objection to, or to request an informal conference on, the application.

[43]  Although not binding, Executive Order 12898 illuminates some of the concerns inherent in a business as usual NEPA approach when dealing with Native American Tribes and other non-English speakers.  *See* Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, 59 Fed. Reg. 7629, 7632 (Feb. 16, 1994)

approval of the 2005 Permit Revision Application is primarily rural, speaks English on a limited basis, and relies upon tribal news sources.  Unsurprisingly, OSM received no public comment before it approved BHP's 2005 Permit Revision Application.

A comparison with the public notice provided in advance of the 2009 Permit Renewal Application demonstrates the inadequacy of the public notice provided for the 2005 Permit Revision Application.  Before approving the 2009 Permit Renewal Application, OSM tailored its public notice to account for the unique characteristics of the local population most affected by actions at the Navajo Mine.  In addition to the notice procedures employed for the 2005 Permit Revision Application, OSM published notice in the *Navajo Times* (the tribal newspaper) and aired advertisements on local Navajo radio stations in the Navajo language.  *Transcript of Oral Argument*, at 29.  Quite tellingly, unlike OSM's notice for the 2005 Permit Revision Application, this notice resulted in significant public comment.  *Id.* at 35.

As evidenced by the process related to the 2009 Permit Renewal Application, OSM is capable of providing effective notice to the population most affected by its actions related to the Navajo Mine.  On remand, OSM shall provide meaningful notice, similar to that provided in advance of its approval of BHP's 2009 Permit Renewal Application, of BHP's Permit Revision Application and, if applicable, any pending FONSI.

*C.  SEIS/SEA*

Plaintiffs next contend that OSM should have prepared a supplemental EIS ("SEIS") to address the ethnographic study and mitigation plan completed as a condition of its approval of

BHP's 2005 Permit Revision Application.[44]  NEPA itself does not explicitly state when environmental impact statements, or environmental assessments, must be supplemented.  "It would be incongruous with [NEPA's] approach to environmental protection," however,  "for the blinders to adverse environmental effects, once unequivocally removed, to be restored before the completion of agency action simply because the relevant proposal has received initial approval."  *Marsh*, 490 U.S. at 371.  Accordingly, the CEQ regulations require agencies to prepare an SEIS or a supplemental EA if "(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[45]  40 C.F.R. § 1502.9(c)(1)(i)-(ii).

An agency need not supplement an EIS or EA "every time new information comes to light after the EIS [or EA] is finalized."  *Marsh*, 490 U.S. at 373; *see also Colo. Envtl. Coal.*, 185 F.3d at 1177.  Rather:

> the decision whether to prepare a supplemental EIS [or EA] is similar to the decision whether to prepare an EIS [or EA] in the first instance: If there remains 'major Federal action' to occur, and if the new information is sufficient to show that the remaining action will [or may] 'affect the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS [or EA] must be prepared.

---

[44]  In their Amended Complaint, Plaintiffs also alleged OSM should have prepared a supplemental environmental analysis in light of the CHIA and the proposed Burnham Road realignment.  As discussed *supra* at n. 11, these claims were dismissed.

[45]  Although the CEQ regulations only address the supplementation of EISs, the standard for preparing a supplemental EA is the same as for preparing an SEIS.  *See S. Utah Wilderness Alliance*, 301 F.3d at 1238 n.19 (10th Cir. 2002), *rev'd* and *remanded* on other grounds, 542 U.S. 55 (2004) (citing *Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562 at 566 & n.2 (9th Cir. 2000); *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218 & n.3 (10th Cir. 1997)).

*Marsh*, 490 U.S. at 374; *see also Greater Yellowstone Coal.*, 572 F.3d at 1122.  Stated differently, "the new circumstance[s] must present a seriously different picture of the environmental impact of the proposed project from what was previously envisioned."  *Sierra Club v. Froehlke*, 816 F.2d 205, 210 (5th Cir. 1987) (citing *Wisconsin v. Weinberger*, 745 F.2d 412, 421 (7th Cir. 1984)).

In evaluating an agency's decision not to prepare an SEIS or supplemental EA, courts utilize a two part test.  First, they look to see if the agency took the requisite "hard look" at new information to determine whether supplemental analysis is necessary.  *S. Utah Wilderness Alliance*, 301 F.3d at 1238.  In determining whether an agency has taken this "hard look," the court "may consider whether the agency obtains opinions from its own experts, obtains opinions from experts outside the agency, gives careful scientific scrutiny, responds to all legitimate concerns that are raised or otherwise provides a reasoned explanation for the new circumstance's lack of significance."  *Id.* (citations omitted).  Second, courts review the agency's decision not to prepare an SEIS or supplemental EA under the APA's "arbitrary and capricious" standard.  *Id.* (citations omitted).

As noted above, the 2005 Permit Revision EA recognized the existence of seventy-three notable sites, thirty-four of which are considered eligible for nomination to the National Register of Historic Places as well as several traditional cultural properties, including possible burials, within Area IV North.  It did not, indeed it could not, analyze the impacts of OSM's adoption of the ethnographic study and mitigation plan as the documents had not yet been completed.[46]  In fact, OSM's adoption of the ethnographic study and mitigation plan have completely evaded

---

[46]  *See supra* n. 41.

environmental review.  There is no evidence in the record that OSM has taken the requisite "hard look" at the information in the study and plan.   I need not order a Supplemental EA, however, because on remand OSM will be required to include an analysis of the information contained in the ethnographic studies (particularly the mitigation/data recovery plans) in its revised EA for the 2005 Permit Revision Application.

## VI.  Conclusion

Defendants approved BHP's 2005 Permit Revision Application without complying with the procedural requirements of NEPA.  Accordingly, I VACATE Defendants' approval of the 2005 Permit Revision Application and REMAND to the agency for further proceedings consistent with this decision.  Specifically, Defendants shall:

1.  Address the presumption that approval of the 2005 Permit Revision Application is a type of action for which an EIS is normally prepared;

2.  Consider the environmental effects of the Burnham Road Realignment in connection with its analysis of the 2005 Permit Revision Application;

3.  Include a meaningful discussion of all reasonable alternatives, including approving the 2005 Permit Revision Application with conditions;

4.  Discuss the specific mitigation measures proposed in the ethnographic studies in determining the severity of the effects that BHP's 2005 Permit Revision Application will have on scientific, historic, and cultural resources in Area IV North;

5.  Include in their revised EA a discussion of CCW to the extent it is mentioned in the 2005 Permit Revision Application; and

6.  Provide meaningful public notice, including but not limited to publication in the Navajo Times and airing advertisements in both English and Navajo on local Navajo radio stations, for all future actions related to its permitting responsibilities at the Navajo Mine.

It is FURTHER ORDERED that all pending motions are DENIED as moot.


Dated:  October 28, 2010                    BY THE COURT:

                                            **/s/ John L. Kane**
                                            SENIOR U.S. DISTRICT JUDGE

46